UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

MARK R. PETERSEN,

        Plaintiff,

    v.                             Case No. 22-C-684

STEFANIE PEDERSEN,

        Defendant.

---

## DECISION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

This case arises out of the December 27, 2018, arrest of Plaintiff Mark Petersen by Defendant Winnebago County Sheriff's Deputy Stefanie Pedersen in Neenah, Wisconsin. Plaintiff brought this 42 U.S.C. § 1983 action against Defendant, asserting that Defendant violated his Fourth and Fourteenth Amendment rights because there was no probable cause to justify the arrest and subsequent blood draw of Plaintiff. The court has jurisdiction over the action pursuant to 28 U.S.C. § 1331. This matter comes before the court on Defendant's motion for summary judgment. For the following reasons, the motion will be granted and the case dismissed.

## BACKGROUND

On December 27, 2018, at about 8:30 p.m., Defendant received a call from Winnebago County Sheriff's Office dispatch reporting that a car had crashed at 1339 County Trunk JJ in Neenah, Wisconsin. Def.'s Proposed Findings of Fact (DPFOF) ¶ 2, Dkt. No. 33. According to the dispatch call Defendant received, the crashed vehicle was sitting in the driveway of the property located at 1339 County Trunk JJ. *Id.* ¶ 3. Defendant was the first responding officer to arrive at the scene. *Id.* ¶ 4. Upon her arrival, Defendant saw tire track marks leading toward a tree in the

front yard of the property with some small branches on the ground and a vehicle in the driveway facing the street. *Id.* ¶¶ 5–6. Defendant ran the vehicle's plates and learned that the vehicle was registered to Plaintiff. *Id.* ¶ 7. Dispatch advised Defendant that Plaintiff had three prior operating while intoxicated convictions (OWIs), he had a .002 restriction on his license, his driver's license was suspended, and the license plates on the vehicle were suspended. *Id.* ¶ 8.

Defendant observed Plaintiff outside of the vehicle in the driveway attempting to change the front passenger tire of the car. *Id.* ¶ 9. She noted that Plaintiff appeared very unsteady on his feet, was having a hard time keeping his balance, and was wobbling and rocking back and forth even though both of his feet were completely flat on the ground. *Id.* ¶¶ 10–11. There were also three other adult men standing in the driveway who lived at or were guests at the house. *Id.* ¶ 19. Based on Defendant's observations, it appeared to her that the vehicle had been traveling westbound on County Trunk JJ and went off the road on the north side through the front yard of the property. *Id.* ¶ 12.

Defendant exited her squad car and recognized the man by the vehicle as Plaintiff. *Id.* ¶ 13. She was familiar with Plaintiff because of numerous previous calls made to the Winnebago County Sheriff's Office involving Plaintiff and she had previously arrested him. *Id.* ¶¶ 16–17. Defendant was aware that, every time anyone from her department had contact with Plaintiff in the past, he had become uncooperative and argumentative and/or combative with the responding officers. *Id.* ¶ 18.

After exiting her vehicle, Defendant called out to Plaintiff, but he immediately started to walk away from her. *Id.* ¶ 14. Defendant reached out and took Plaintiff's arm to stop him from walking away. *Id.* ¶ 15. There were three other men outside who stood several feet back and watched as Defendant questioned Plaintiff. *Id.* ¶ 20. Defendant began asking Plaintiff what happened, and Plaintiff responded in a slow, slurred voice, "I was just coming here to get my motor

vehicle. What's going on with you?" *Id.* ¶ 21. In speaking to Plaintiff, Defendant almost immediately detected a very strong odor of intoxicants coming from him and observed that he had glassy, bloodshot eyes. *Id.* ¶¶ 26–27. Defendant had been a drug recognition expert with specialized training through Advanced Roadside Impairment Detection Enforcement (ARIDE) for three years. *Id.* ¶ 28. The ARIDE specialization requires Defendant to be extremely proficient at recognizing and understanding the cues that indicate impairment. *Id.* ¶ 29.

Defendant again asked Plaintiff what happened, and Plaintiff responded, "I said. My daughter, she's called me out here. Came out here to fix the tire. You guys know anything about that or are you all good?" *Id.* ¶ 22. Defendant responded that she did not know anything about that. *Id.* ¶ 23. Plaintiff began walking away and waved Defendant away with his hand as he said, "Oh, my daughter will tell you all about it." *Id.* ¶ 24. Defendant directed Plaintiff to stop and grabbed his hand to prevent him from walking away. *Id.* ¶ 25. She then asked Plaintiff, "How did your car end up here?" to which Plaintiff responded in a slurred voice, "My daughter's down here." *Id.* ¶¶ 30–31.

Based on Defendant's prior interactions and familiarity with Plaintiff and his mother, Defendant was aware that Plaintiff had a daughter but had not had any contact with her in a number of years. *Id.* ¶¶ 33–34. Last Defendant had heard, Plaintiff's daughter wanted nothing to do with him, so it surprised Defendant when Plaintiff stated he had been in contact with her or that she had been around him. *Id.* ¶ 35. Defendant asked, "Where is your daughter right now?" *Id.* ¶ 32. Plaintiff responded, "I don't know. Where's your daughter?" *Id.* ¶ 36. Defendant asked again, "Where's your daughter at, Mark?" and Plaintiff replied, "Where's your daughter?" *Id.* ¶¶ 37–38. Defendant asked, "Who was driving the car?" *Id.* ¶ 39. Plaintiff turned slightly and responded, "Daughter." *Id.* ¶ 40.

3

At this point, additional responding officers were approaching Defendant and Plaintiff. *Id.* ¶ 41. Plaintiff indicated to Defendant that he wanted to go smoke a cigarette, but Defendant did not want him to leave. *Id.* ¶ 42. Plaintiff said to Defendant, "Whatever you want to do then, Trisha." *Id.* ¶ 43. Defendant asked, "Who's Trisha?" and Plaintiff said, "That's who's coming to take the tire. My daughter. That's her car." *Id.* ¶¶ 44–45. Defendant then asked Plaintiff, "How did the car end up getting here? That's what I'm asking. With a flat tire. There's damage all through the yard right here." *Id.* ¶ 46. Plaintiff stated, "My daughter. It's what she drives." *Id.* ¶ 47. Defendant asked Plaintiff, "What did you drive to get out here?" and Plaintiff responded, "I don't drive anything. I took the front road, like she'll drive me right here. It's like I don't drive. I don't drive anymore." *Id.* ¶¶ 48–49. Defendant told Plaintiff to stay put and speak with another officer who had arrived on the scene. *Id.* ¶ 50. Plaintiff indicated that he needed to see if his daughter was alright. *Id.* Defendant asked the three bystanders if Plaintiff was the only one in the car. *Id.* ¶ 51. The three bystanders confirmed that Plaintiff was the only person they had seen around the vehicle. *Id.* ¶ 52.

At that point, Defendant believed she had probable cause to arrest Plaintiff on a charge of operating under the influence. *Id.* ¶ 53. She based her conclusion, in part, on the tire tracks and broken branches, which indicated to her that the vehicle had not simply been pulled off the road in a controlled manner; her advanced training and years of experience indicating that Plaintiff was obviously intoxicated based on his slow, slurred speech and unsteadiness on his feet; the knowledge that the only other people on the scene had been at the house on the property and were simply bystanders with no connection to the vehicle or Plaintiff; Plaintiff's claim that the vehicle was his daughter's car, even though Defendant knew that it was registered in Plaintiff's name; Plaintiff's refusal to provide any meaningful answers to questions about his daughter or her whereabouts, despite the fact that he claimed she had been driving; Defendant's knowledge that

4

Plaintiff had previously been arrested for one or more OWIs; and Defendant's past familiarity with Plaintiff and his daughter and her knowledge that Plaintiff had not had contact with his daughter in years. *Id.* ¶ 54. Upon determining that she had probable cause to arrest Plaintiff for drunk driving, Defendant told Plaintiff to put his hands behind his back because he was under arrest. *Id.* ¶ 55.

After Plaintiff was handcuffed, an officer assisting Defendant asked Plaintiff if his daughter was in the car. *Id.* ¶ 56. Plaintiff mumbled in response, "My daughter. My daughter? I don't answer [unintelligible] no questions." *Id.* ¶ 57. Defendant then searched Plaintiff and located the keys to the vehicle in one of his coat pockets. *Id.* ¶ 58. She asked Plaintiff if he had any open court cases, but he did not respond. *Id.* ¶ 59. As Defendant searched Plaintiff, he began to step or shift forward, away from Defendant. *Id.* ¶ 60. Defendant told Plaintiff to stay put, and another officer had to stand in front of Plaintiff to hold him in place. *Id.* ¶ 61. She found lug nuts in one of Plaintiff's pockets and asked, "So you started to take the tire off? Is that what the lug nuts are from?" *Id.* ¶ 62. Plaintiff slurred in response, "I told you. It's my daughter. [Unintelligible] tomorrow morning." *Id.* ¶ 63. He continued to mumble unintelligibly as Defendant continued to search his pockets. *Id.* ¶ 64. After Defendant finished searching his pants, Plaintiff became agitated. *Id.* ¶ 65. Defendant pointed to her vehicle and said, "Alright. Let's go back to the squad" and began leading Plaintiff toward it. *Id.* ¶ 66. After a few seconds of walking to the squad car, Plaintiff turned toward Defendant with a confused look and said, "On what?" *Id.* ¶ 67. As Defendant tried to place Plaintiff in the back of the squad car, he resisted her efforts and continued to ask, "On what?" *Id.* ¶ 68. Defendant reminded Plaintiff that he was under arrest for an OWI, and Plaintiff said, "I wasn't even driving, man." *Id.* ¶ 69. Plaintiff continued to struggle against officers' efforts to place him in the car, and Defendant had to tell him not to try to kick her. *Id.*

¶ 70.  Plaintiff was argumentative with officers and slurred his words as they attempted to buckle him in the squad car.  *Id.* ¶ 71.  He yelled to officers, "You buckle it up, buttercup!"  *Id.* ¶ 72.

After Plaintiff was secured in the back seat, Defendant got into her squad car and began entering the necessary information into the computer system.  *Id.* ¶ 73.  Defendant asked Plaintiff what his daughter's phone number was, but Plaintiff did not respond.  *Id.* ¶¶ 74–75.  Because Plaintiff did not respond to her questions about his daughter, Defendant called his mother, Sandra Lehman, with whom Defendant was familiar as a result of previous contacts.  *Id.* ¶ 76.  Defendant explained that she was with Plaintiff and asked if his daughter was driving his car today.  *Id.* ¶ 77.  Lehman answered, "No."  *Id.* ¶ 78.  By this point, Defendant had begun driving toward the hospital to obtain a blood draw from Plaintiff.  *Id.* ¶ 79.  Defendant asked Lehman for Plaintiff's daughter's phone number.  *Id.* ¶ 80.  Although Lehman did not have the current phone number, she provided what information she had about Plaintiff's daughter, Aubrey.  *Id.*  Lehman told Defendant that, if Plaintiff had been in contact with Aubrey, she would be extremely surprised given their longstanding estrangement.  *Id.* ¶ 81.  Defendant asked Lehman if she knew who "Trisha" was, and Lehman replied that she did not know who that could be.  *Id.* ¶ 82.  After concluding her phone call with Lehman, Defendant radioed dispatch and asked them to look up Aubrey and obtain her phone number.  *Id.* ¶ 83.  Plaintiff remained silent in the back of the squad car during Defendant's conversation with Lehman and throughout the drive to the hospital.  *Id.* ¶ 84.  He did not provide Defendant with any contact information for Aubrey or ask why Defendant was trying to contact her.  *Id.* ¶ 85.

Defendant arrived at Theda Clark Medical Center with Plaintiff at approximately 8:56 p.m. *Id.* ¶ 86.  She parked the squad car and asked Plaintiff for Aubrey's phone number.  *Id.* ¶ 87. Plaintiff responded, "I don't know.  Why don't you fucking ask her?"  *Id.* ¶ 88.  He then said, "I don't fucking answer questions.  This is about fucking time I'm done fucking answering questions,

6

hot shot." *Id.* ¶ 89.  Defendant asked Plaintiff, "Are you going to give me Aubrey's phone number so I can corroborate your story?" *Id.* ¶ 90.  Plaintiff mumbled something in response that was unintelligible but ended with "right of the end of my fucking dick, so shut the fuck up.  I'm done answering questions.  What else do you want to know?" *Id.* ¶ 91.  Defendant responded, "Aubrey's phone number." *Id.* ¶ 92.  Plaintiff only repeated, "I'm done answering fucking questions" and continued to mumble and swear. *Id.* ¶ 93.  Nothing Plaintiff was saying to Defendant made much sense to her. *Id.* ¶ 94.

Defendant continued to enter information into the computer system in her squad car as she and Plaintiff remained parked at the hospital. *Id.* ¶ 95.  She told Plaintiff that he was receiving two citations: one for operating a motor vehicle while intoxicated, fourth offense, and one for operating with suspended license plates. *Id.* ¶ 96.  Defendant then read Plaintiff the required "Informing the Accused" under Wisconsin's implied consent law. *Id.* ¶ 97.  The script concludes with the question, "Will you submit to an evidentiary chemical test of your blood?" *Id.*  Plaintiff remained silent after being asked if he would submit to a blood test, and Defendant told him that if he would not answer, it would be considered a refusal. *Id.* ¶ 98.  Plaintiff never responded to the question about submitting to a blood test despite being asked multiple times. *Id.* ¶ 99.  Defendant again asked Plaintiff for Aubrey's phone number, but Plaintiff's only response was "I got more fucking cars and fucking whips than you got fucking bit coin.  Ok?  Good.  I've got more fucking bit coins than you got fucking pairs of shoes.  So let's fucking go." *Id.* ¶ 101.  Defendant reminded Plaintiff that if he did not respond with a yes or no to the question about a blood draw, she would have to take it as a refusal. *Id.* ¶ 102.  Plaintiff responded, "Ok.  I got people that are waiting on me.  About time to go.  I ain't changing no fucking tires.  I ain't gonna fucking ride in your limo.  I don't give a fuck what you wanna talk to me about, but I gotta go." *Id.* ¶ 103.

7

Defendant then stepped out of her squad car and asked other officers who had arrived to watch Plaintiff while she called the on-call judge, Judge Karen L. Siefert, to obtain a warrant. *Id.* ¶ 104. Under oath, Defendant truthfully relayed to Judge Siefert what she observed and answered the judge's questions. *Id.* ¶ 105. Upon Defendant obtaining the warrant for a blood draw from Judge Siefert, hospital staff were eventually able to obtain a blood draw from Plaintiff despite considerable physical resistance. *Id.* ¶ 107. The results of the blood draw confirmed ethanol detected in Plaintiff's blood of 0.213 g/100 mL. *Id.* ¶ 108.

In the resulting criminal case, *State v. Mark Petersen*, Case No. 18-CF-847 (Winnebago Cty., Wis.), Plaintiff's criminal defense counsel filed a motion to suppress on May 25, 2021, asserting a lack of reasonable suspicion for the blood draw and a lack of probable cause for the arrest. *Id.* ¶ 109. The court held a hearing on the motion on July 29, 2021, at which Defendant testified and the court requested briefing. *Id.* ¶ 110. The court ultimately ruled on September 22, 2021, that Defendant had reasonable suspicion for the blood draw but lacked probable cause to arrest Plaintiff. *Id.* ¶ 111.

## LEGAL STANDARD

Summary judgment is appropriate when the moving party shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In deciding a motion for summary judgment, the court must view the evidence and make all reasonable inferences in the light most favorable to the non-moving party. *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018) (citing *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 812 (7th Cir. 2017)). The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted). "The nonmoving party must do more than simply show that there is some

metaphysical doubt as to the material facts." *Id.* Where a video recording exists, and "[t]here are no allegations or indications that this videotape was doctored or altered in any way, nor any contention that what it depicts differs from what actually happened," a court must view "the facts in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 378–81 (2007). Summary judgment is properly entered against a party "who fails to make a showing to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Austin v. Walgreen Co.*, 885 F.3d 1085, 1087–88 (7th Cir. 2018) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

## ANALYSIS

### A. Motion to take Judicial Notice and Motion to Strike

On November 21, 2023, about a week after Defendant filed her reply brief in support of her motion for summary judgment, Plaintiff filed a motion to take judicial notice of two decisions: *Eaves v. Village of Dolton*, No. 12-C-2986 (N.D. Ill. May 12, 2014), and *State v. Young*, 212 Wis. 2d 417, 569 N.W.2d 84 (Ct. App. 1997). Plaintiff asserts that both cases are relevant to whether there was probable cause to arrest him. Defendant subsequently filed a motion to strike Plaintiff's motion to take judicial notice because it is an improper sur-reply.

The local rules of this district provide for three sets of filings for a motion for summary judgment: (1) the moving party's opening brief, (2) the non-moving party's response, and (3) the moving party's reply. Civil L.R. 56(b). The "purpose of having a motion, response and reply is to give the movant the final opportunity to be heard and to rebut the non-movant's response, thereby persuading the court that the movant is entitled to the relief requested by the motion." *Best v. Safford*, No. 16-cv-2549, 2018 WL 1794911, at *2 (S.D. Ind. Apr. 16, 2018) (citation omitted). The purpose of a sur-reply is to address new arguments or issues raised in the reply brief. Defendant's reply brief did not raise new arguments or evidence. In addition, both cases Plaintiff

9

cites were decided well before Plaintiff filed his response to the motion for summary judgment, and he does not explain why he could not have referred to them earlier in that brief. Accordingly, Defendant's motion to strike Plaintiff's motion to take judicial notice will be granted, and Plaintiff's motion to take judicial notice will be stricken from the record. The court now turns to the motion for summary judgment.

**B. Motion for Summary Judgment**

　　**1. Arrest**

Plaintiff's claim for false arrest arises under the Fourth Amendment, which prohibits unreasonable searches and seizures. "To prevail on a Fourth Amendment false-arrest claim, a plaintiff must show that there was no probable cause for his arrest." *Braun v. Vill. of Palatine*, 56 F.4th 542, 548 (7th Cir. 2022) (citation omitted). Defendant concedes that Plaintiff was "seized" when he was arrested but contends that she had probable cause to arrest Plaintiff for operating a motor vehicle while intoxicated in violation of Wis. Stat. § 346.63 and for operating with suspended license plates.

"The existence of probable cause to arrest is an absolute defense to any § 1983 claim against a police officer for false arrest or false imprisonment." *Abbott v. Sangamon Cty., Illinois*, 705 F.3d 706, 714 (7th Cir. 2013). "Probable cause does not require certainty. It is a fluid concept that relies on the common-sense judgment of the officers based on the totality of the circumstances." *Hart v. Mannina*, 798 F.3d 578, 587 (7th Cir. 2015) (cleaned up). Although probable cause requires something more than a hunch, it "does not require a finding that it was more likely than not that the arrestee was engaged in criminal activity—the officer's belief that the arrestee was committing a crime need only be reasonable." *Abbott*, 705 F.3d at 714. It is a common-sense, objective inquiry based on "what the officer knew at the time of the arrest" and "'viewed from the standpoint of an objectively reasonable police officer.'" *Id.* (quoting *Maryland*

10

*v. Pringle*, 540 U.S. 366, 371 (2003)). The standard also "inherently allows room for reasonable mistakes." *Id.* "There is no requirement that the officer's belief be correct or even more likely true than false, as long as it is reasonable." *Braun*, 56 F.4th at 549 (cleaned up).

Whether Defendant had probable cause to arrest Plaintiff depends on the elements of the crime at issue. Wisconsin's operating while intoxicated statute provides, "No person may drive or operate a motor vehicle while [u]nder the influence of an intoxicant . . . [or] under the influence of any other drug to a degree which renders him or her incapable of safely driving." Wis. Stat. § 346.63(1)(a). In this case, Plaintiff's behavior and the totality of the circumstances provided probable cause to believe that he had committed the offense of driving while intoxicated in violation of Wis. Stat. § 346.63 and operating with suspended license plates.

Defendant responded to a report of a car crash at a residence in Neenah, Wisconsin. Upon arrival, Defendant observed tire tracks leading toward a tree in the front yard and small branches on the ground, indicating that the vehicle had not been pulled off the road in a controlled manner. The only person she observed near the vehicle was Plaintiff, who was attempting to change the front passenger tire. Plaintiff, who was the registered owner of the vehicle, slurred his speech, had bloodshot and glassy eyes, and had difficulty balancing. Defendant detected a very strong odor of intoxicants coming from Plaintiff. Defendant also determined that Plaintiff had three prior OWIs, he had a .002 restriction on his license, his driver's license was suspended, and the license plates on the vehicle were suspended.

In addition, Plaintiff's explanation for the accident and who had been driving the car did not make sense. Plaintiff indicated that the car was his daughter's and that she was the one who had been driving it. But the car was registered in Plaintiff's name, and he refused to provide any meaningful answers to questions about his daughter's current whereabouts or her phone number. The only other individuals on the scene resided in or were guests at the house on the property, had

no connection to the vehicle or Plaintiff, and did not report seeing anyone other than Plaintiff anywhere near the vehicle. Based on her prior experiences with Plaintiff, Defendant knew that he had not had contact with his daughter in years. The totality of the facts and circumstances, considered together, gave Defendant probable cause to believe that Plaintiff was driving while intoxicated.

Plaintiff asserts that Defendant did not have probable cause to arrest him because no one actually saw Plaintiff driving the vehicle. But an officer does not need to rely on her own personal observations or other eyewitness accounts to form a basis for probable cause to arrest. "Probable cause exists to arrest a suspect if at the time of arrest the facts and circumstances within the arresting officer's knowledge and of which he has reasonably trustworthy information would warrant a prudent person in believing that the suspect had committed or was committing an offense." *Dollard v. Whisenand*, 946 F.3d 342, 354 (7th Cir. 2019) (citation omitted). Even though Defendant did not personally witness Plaintiff behind the wheel of the vehicle, she determined, based on the available information, that it was reasonably probable that Plaintiff had committed the crime of operating the vehicle while intoxicated.

Plaintiff also argues that Defendant had predetermined bias against him and detained him based on her prior knowledge, not the present circumstances. However, Defendant was entitled to rely on her training and experience with Plaintiff, including her prior interactions with Plaintiff and her knowledge about his family history, to draw reasonable inferences to determine whether the circumstances she confronted at the time rose to the level of probable cause. *See Thompson v. Wagner*, 319 F.3d 931, 934–35 (7th Cir. 2003) ("Arresting officers may draw reasonable inferences based on their training and experience in determining whether suspicious circumstances rise to the level of probable cause.").

Under the totality of the circumstances, Defendant reasonably believed that Plaintiff operated a motor vehicle while intoxicated in violation of Wis. Stat. § 346.63 and with suspended license plates. The court concludes that Defendant had probable cause to arrest Plaintiff. Accordingly, summary judgment is granted in favor of Defendant on Plaintiff's false arrest claim.

2. **Blood Draw**

"The Fourth Amendment guards the 'right of the people to be secure in their persons . . . against unreasonable searches' and provides that 'no Warrants shall issue, but upon probable cause.'" *Mitchell v. Wisconsin*, 139 S. Ct. 2525, 2534 (2019). Because a blood draw is a "search" of a person, a search warrant for a blood draw must be supported by probable cause. *See Illinois v. Gates*, 462 U.S. 213, 239 (1983). Probable cause exists when the sworn testimony "presents a total set of circumstances which create a 'fair probability' that a search will uncover evidence of a crime." *See United States v. Haynes*, 882 F.3d 662, 665 (7th Cir. 2018).

Plaintiff asserts that the search warrant issued to draw his blood was not supported by probable cause because Defendant provided false statements to acquire the search warrant. He maintains that Defendant noted in a handwritten probable cause statement that Plaintiff "was operating a motor vehicle" and "crashed his vehicle into the yard." Pl.'s Br. at 9, Dkt. No. 37. But Judge Siefert did not rely on any handwritten probable cause statement in issuing the warrant; she only relied on Defendant's statements made during a recorded telephone call. The transcript of the telephone call reveals that Defendant never stated that Plaintiff was driving the vehicle. Instead, Defendant explicitly stated that she did not see Plaintiff driving the vehicle, the individuals who called to report the crash did not actually see the crash occur, and the witnesses on the scene did not actually see Plaintiff driving the car. *See* Dkt. No. 34-4 at 6.

Defendant reiterated that she was called to the residence in Neenah based on reports that a vehicle had drove through the yard and was in the driveway with a male changing the tires. *Id.* at

13

4. She stated that she recognized the subject as Plaintiff. Defendant indicated that Plaintiff was rocking back and forth, had a hard time to keep his balance, had slow, slurred speech and a very strong odor of intoxicants coming from him, and had started to walk away from Defendant when she tried to talk to him. *Id.* Although Plaintiff stated that his daughter was the one driving the vehicle, Plaintiff did not have contact with his daughter for a number of years, which was confirmed by Plaintiff's mother. Defendant stated that the individuals at the house reported that Plaintiff was the only individual that they ever saw in the area of the vehicle. *Id.* at 5. The judge determined that, "[b]ased on the observations of the individuals who called you and a slowed, slurred speech, the odor of intoxicants and the essentially unexplained driving behaviors, I do find that you have probable cause for a blood draw to test for alcohol." *Id.* at 8.

After considering the statements Defendant made to Judge Siefert, the court concludes that the search warrant authorizing the blood draw was supported by probable cause. Therefore, Defendant is entitled to summary judgment on this claim.

### 3. Qualified Immunity

Defendant argues, in the alternative, that Plaintiff's claims should be dismissed because she is immune from civil liability for any constitutional violation that may have occurred. Under the doctrine of qualified immunity, government officials performing discretionary functions are immune from civil liability for constitutional violations "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton*, 483 U.S. 635, 638 (1987). "Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam) (quoting *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (per curiam)).

Although qualified immunity is a defense to a § 1983 action, once the defendant raises it, the plaintiff has the burden to defeat it. *Sebesta v. Davis*, 878 F.3d 226, 233 (7th Cir. 2017). The plaintiff must show the deprivation of a constitutional or statutory right and the right must be clearly established at the time of the defendant's conduct. *Saucier v. Katz*, 533 U.S. 194, 201–02 (2001). Determining whether the right is "clearly established" "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (cleaned up). The Supreme Court has "repeatedly told courts . . . not to define clearly established law at a high level of generality" and has reversed federal courts in qualified immunity cases where the lower courts "wrongly subject individual officers to liability." *City & Cty. of San Francisco v. Sheehan*, 575 U.S. 600, 613 & n.3 (2015) (quotation marks omitted). The Court has instructed: "An officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in his shoes would have understood that he was violating it, meaning that existing precedent placed the statutory or constitutional question beyond debate. This exacting standard gives government officials breathing room to make reasonable but mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Id.* (cleaned up).

Here, the court must determine whether a constitutional rule applies with obvious clarity such that it placed Defendant on notice that her conduct was unlawful. It must "examine Supreme Court precedent and precedent from [the Seventh Circuit] to determine whether a right was clearly established at the time of the violation." *Mason-Funk v. City of Neenah*, 895 F.3d 504, 508–09 (7th Cir. 2018) (citation omitted); *see also Boyd v. Owen*, 481 F.3d 520, 527 (7th Cir. 2007) (noting that "district court decisions have no weight as precedents and therefore cannot clearly establish a constitutional right"). Plaintiff contends that "[t]he right to be free from arrest without probable cause has been clearly established." Pl.'s Br. at 11. But Plaintiff has not identified, and the court

15

has not found, controlling precedent that "squarely governs the specific facts at issue" and clearly establishes that Defendant's conduct violated Plaintiff's constitutional rights. *Kisela*, 138 S. Ct. at 1152. Because Plaintiff has not presented cases that put the constitutional questions in this case "beyond debate," Defendant is entitled to qualified immunity on Plaintiff's claims. For this reason as well, Defendant's motion for summary judgment is granted.

## CONCLUSION

For these reasons, Defendant's motion for summary judgment (Dkt. No. 31) is **GRANTED**. Defendant's motion to strike Plaintiff's motion to take judicial notice (Dkt. No. 40) is **GRANTED**, and Plaintiff's motion to take judicial notice (Dkt. No. 39) is **STRICKEN** from the record. The case is dismissed. The Clerk is directed to enter judgment accordingly.

**SO ORDERED** at Green Bay, Wisconsin this 30th day of January, 2024.

s/ William C. Griesbach
William C. Griesbach
United States District Judge